# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| GLORIA MALONE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case number 4:07cv1896 CAS** |
| | ) | **TCM** |
| MICHAEL J. ASTRUE, | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Gloria

Malone ("Plaintiff") supplemental security income benefits ("SSI") under Title XVI of the

Social Security Act ("the Act"), 42 U.S.C. § 1381-1383b. Plaintiff has filed a brief in support

of her complaint; the Commissioner has filed a brief in support of his answer. The case was

referred to the undersigned United States Magistrate Judge for a review and recommended

disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Plaintiff applied for SSI in June 2005, alleging a disability since July 2003 caused by

severe headaches and arthritis in her hips, legs, and feet. ®.[1] at 52-55.) Her application was

---

[1]References to "R." are to the administrative transcript filed by the Commissioner with his
answer.

denied initially and after a hearing held in July 2006 before Administrative Law Judge ("ALJ") F. Terrel Eckert, Jr. (<u>Id.</u> at 8-19, 40-45, 258-79.)  The Appeals Council denied Plaintiff's subsequent request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (<u>Id.</u> at 3-5.)

## **<u>Testimony Before the ALJ</u>**

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

She testified that she was born on January 7, 1959, and was then 47 years old. (<u>Id.</u> at 264.)  She was 5 feet 4 inches tall and weighed approximately 180 pounds. (<u>Id.</u> at 266.)  Her doctor had told her to lose weight to reduce the strain on her back. (<u>Id.</u> at 267.)  She was right-handed. (<u>Id.</u>)

Plaintiff was separated but had been living with her son's father since 2001 because of her financial situation. (<u>Id.</u> at 264.)  Her 22-year old son also lived there. (<u>Id.</u> at 265.)  Her son was not employed, but was looking for work. (<u>Id.</u>)  Her ex-husband was disabled by rheumatoid arthritis. (<u>Id.</u>)  His disability and help from her family were their sources of income. (<u>Id.</u>)

Plaintiff further testified that the last grade she had completed was the ninth. (<u>Id.</u> at 266.)  She had been in regular education classes and could read and write. (<u>Id.</u>)  She had difficulty with basic arithmetic. (<u>Id.</u>)

Plaintiff last worked in 2001. (<u>Id.</u> at 268.)  She had been working as a home health care aide and had to quit because of her back. (<u>Id.</u>)  She can not return to that work because

of problems with her back and right hip.  (Id. at 269.)  She can not sleep at night because of pain in her right hip.  (Id.)  Her back pain makes it difficult for her to move around.  (Id.)  For instance, it is hard for her to go from a seated position to a standing position.  (Id. at 270.)  She cannot sit for longer than thirty minutes without getting stiff.  (Id.)  She cannot stand for longer than thirty minutes without her legs hurting and cannot walk farther than two blocks without her back hurting.  (Id. at 270-71.)  She cannot bend forward from the hips without a burning pain.  (Id. at 271.)  The heaviest thing she can lift is her cane, which weighs one or two pounds.  (Id.)  She can carry a purse, but not a gallon of milk.  (Id.)

Plaintiff further testified that she cannot do housework.  (Id. at 272.)  Her son helps with it and helps with the cooking.  (Id.)  When she goes to the grocery store, she uses a motorized cart.  (Id.)  She has been doing so since approximately 2002.  (Id.)

Plaintiff does not belong to any groups, clubs, or organizations.  (Id. at 274.)  She does not visit with relatives and friends because she has been sick and depressed.  (Id.)  Her family does not live in town and visits only occasionally at Christmas.  (Id.)  She has no friends.  (Id. at 275.)  She spends her time watching television and reading her Bible.  (Id.)

Plaintiff recently broke her toe when she lost her balance.  (Id.)  She fractured her arm the year before when she tripped and fell.  (Id. at 275-76, 277.)  It still causes her occasional pain when the weather is bad.  (Id. at 278.)  The fracture had been treated with a sling.  (Id.)  She's been told she has rheumatoid arthritis in her arm.  (Id.)

She also has thyroid problems and headaches.  (Id. at 276.)  The headaches occur monthly, last for approximately one week, and are relieved by shots.  (Id. at 277.)  Recently, she takes over-the-counter medication for her headaches or uses cold towels.  (Id.)

Plaintiff came to the hearing using a cane.  (Id. at 262.)  She has been using it for four to five years – ever since her back went out.  (Id. at 263.)  The cane helps with her balance.  (Id. at 263-64.)  She uses it inside and outside the house.  (Id. at 264.)  Her doctor did not prescribe it, nor has he said anything about it at all.  (Id. at 263.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, records from various health care providers, and the report of a consultant.

When applying for SSI, Plaintiff completed a pain questionnaire, describing the pain as sharp and throbbing and as daily being in her lower back and right hip and foot.  (Id. at 101.)  This pain occurs when she is sleeping, standing, walking, or sitting.  (Id.)  The pain has limited her activities for about four years.  (Id.)  She sometimes uses a heating pad to relieve the pain and sometimes takes pain medication, which makes her drowsy.  (Id.)

Plaintiff also completed a disability report when applying for SSI.  (Id. at 110-19.)  She listed her height as 5 foot 4 inches and her weight as 183 pounds.  (Id. at 110.)  Pain from a protruding disc, severe headaches, and arthritis in her right hip prevents her from standing, sitting, or walking for long.  (Id. at 111.)  Her impairments first caused her pain in January 2001 and prevented her from working on January 9, 2003.  (Id.)  She takes two medications

for pain, both make her drowsy.  (Id. at 116.)  She takes another medication to prevent bone

disease; this medication has no side effects.  (Id.)  She completed the 11th grade, probably in

1978, and has had no further education.  (Id. at 117.)  She had not been in special education

classes.  (Id.)

A friend completed a report in June 2005 describing Plaintiff's ability to function.  (Id.

at 77-84.)  He explained that he visited Plaintiff once or twice a week.  (Id. at 77.)  They

would sit and talk about old times.  (Id.)  Asked to describe what Plaintiff did from waking

up to going to bed, he reported that she needed help getting in and out of the tub and that she

lay in bed and watched television.  (Id.)  She had no problem brushing her hair or feeding

herself, but did have difficulties dressing, bathing, using the toilet, walking, and lifting.  (Id.

at 78.)  She lived with her son, but did not take care of him.  (Id. at 77, 78.)  She did not

prepare her own meals, do any household chores, or drive.  (Id. at 79-80.)  She shopped for

groceries and personal items once a month; the task took two hours.  (Id. at 80.)  Her hobbies

were reading and watching television; her pain caused her to lose interest in doing anything

but resting.  (Id. at 81.)  She did not get out like she used to.  (Id.)  Her impairments caused

her difficulty when lifting, squatting, bending, standing, walking, sitting, kneeling, or climbing

stairs.  (Id. at 82.)  Also, her memory was affected.  (Id.)  She could not walk farther than one

block before having to rest for approximately fifteen minutes, and she used a cane when

walking.  (Id. at 82, 83.)  The cane had not been prescribed by a doctor.  (Id. at 83.)  She had

no difficulties following spoken or written instructions or in getting along with authority

figures.  (Id. at 82.)  She did not, however, handle stress well.  (Id. at 83.)

Plaintiff also completed two function reports. (<u>Id.</u> at 85-91, 102-09.) She reported that she lived in an apartment with her son's father. (<u>Id.</u> at 85, 102.) Asked to describe what she did during the day, she replied that she bathed, with help, dressed, ate breakfast and dinner, and stayed in her room and watched television all day. (<u>Id.</u>) She could no longer walk or sit as she used to, or be as sexually active as she was formerly. (<u>Id.</u> at 86.) She went to the doctor two to three times a month or to the grocery store once a month. (<u>Id.</u> at 87, 90, 105.) On one function report, she stated that she went outside only to visit the doctor; on another, she stated that she went outside three times a week. (<u>Id.</u> at 87, 105.) She did not prepare any meals – she could not stand or sit to cook. (<u>Id.</u> at 88, 104.) She did not like being around family or friends. (<u>Id.</u> at 89.) On one form, she described herself as having attitude problems. (<u>Id.</u> at 89.) She could walk no farther than one block before having to stop and rest for one hour. (<u>Id.</u>) She could not pay attention for long and had difficulties following instructions. (<u>Id.</u>) She also had difficulties lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, concentrating, and getting along with others. (<u>Id.</u>) On another form, she reported that she followed instructions "very well." (<u>Id.</u> at 107.) She had to rest for fifteen to twenty minutes after walking one block. (<u>Id.</u>) She did not mark that her impairments affected her ability to concentrate or get along with others. (<u>Id.</u>) She watched television "every day all night." (<u>Id.</u> at 90.) She could not handle stress, would get depressed, and had nightmares, night sweats, and shakes. (<u>Id.</u> at 91, 108.) She used a cane all the time; it had not been prescribed by a doctor. (<u>Id.</u>)

On a form completed after the initial denial of her application, Plaintiff reported that the pain in her right hip had worsened since she had applied for SSI; she could not lift or cross her leg. (Id. at 62.) She could not put her clothes or socks on, could not tie her shoes, and could not get in the shower or tub without help. (Id. at 66.) Since completing her last report, she had seen Drs. Wright and Shaw. (Id. at 63, 64.) Three medications prescribed by Dr. Wright caused drowsiness. (Id. at 65.)

Plaintiff's earnings record includes annual income of $144.00 in 1978; $558.00 in 1980; $269.71 in 1997; $2,021.37 in 1998; $2,298.00 in 1999; $3,507.80 in 2000; and $1,761.25 in 2001. (Id. at 46.) There are no listed annual earnings for the years 1979, 1981 through 1996, inclusive, or after 2001. (Id.)

A resume of Plaintiff lists five jobs as a home health care aide: the longest was for April 1998 to November 1999, the next longest was from January to June 2000, and the third longest was from June to September 2000. (Id. at 47.) The remaining two jobs were for one month each. (Id.) The year 1978 was listed for her last year in high school.[2] (Id.) A work history reported completed by Plaintiff in August 2005 also listed five jobs as a home health care aide. (Id. at 93.) The longest of these was from December 2000 to May 2002. (Id.) The next longest was from April 1998 to October 1999. (Id.) The third and fourth longest were for three months each. (Id.)

Plaintiff's medical records begin in June 2004 and, unless otherwise noted, are from St. Louis ConnectCare ("SLCC").

---

[2]Plaintiff would have been 19 years old in the spring of 1978.

On June 4, 2004, Plaintiff went to the SLCC urgent care center with complaints of right hip and foot pain. (Id. at 225-29.) It was noted that she was a patient of the neurology clinic and was to begin physical therapy in a few days. (Id. at 226, 227.) The diagnosis was back pain, right foot pain, and lumbar disc disease at L4-L5. (Id. at 227, 228.) She was given Ultram and instructed to follow-up in the clinic on July 14. (Id.)

Two days[3] after falling and injuring her left wrist, Plaintiff again went to the urgent care center on June 9 (Id. at 217-24.) On examination, the lower third of her left forearm was swollen and tender. (Id. at 219.) She had a restricted range of movement in her left arm but not in her fingers. (Id.) An x-ray revealed a "small ossific density along the radial aspect of the carpal navicular bone" suggestive of an old chip fracture. (Id. at 220.) She was discharged with instructions to apply warm compresses and keep her left arm in a sling and was to return for an appointment on June 16. (Id. at 222.)

On June 14, Plaintiff consulted the SLCC neurology clinic for burning foot pain and lower back pain. (Id. at 148.) She was prescribed Celebrex for the back pain. (Id.) Her gait was normal. (Id.) Her strength was 5/5 with a "give way component" in her lower extremities. (Id.) It was noted that she was to have a lumbar magnetic resonance imaging ("MRI") and was to see the physical therapy clinic. (Id.)

As instructed when in the urgency care center, Plaintiff went on June 16 to the orthopedic clinic for her complaints of left arm and wrist pain. (Id. at 147.) She reported that

---

[3]The intake notes state at one point that the fall had happened two days before and at another point that it was ten days before. (Id. at 218, 219.)

she had fallen on her hands ten days earlier and then, after five days, had experienced pain in her left wrist and hand.  (Id.)  Her wrist and hand were placed in a stint and sling and she was given Ultram for the pain.  (Id.)

Plaintiff went to the urgent care center on June 22 for complaints of abdominal and right side pain.  (Id. at 212-16.)  She was reported to have a history of arthritis.  (Id. at 213.)  The diagnosis was abdominal pain.  (Id. at 214, 215.)  She was to stop taking Vioxx and to start taking Tylenol four times a day and drinking two tablespoons of Maalox.  (Id.)

Plaintiff was seen in the orthopedic clinic on July 1.  (Id. at 145.)  An x-ray revealed no fracture, dislocation, or bone destruction and only minimal generalized osteopenia (decreased calcification or bone density).  (Id. at 145, 230.)  She had a good range of motion in that wrist and no tenderness.  (Id. at 145.)  She requested a work excuse.  (Id.)

On July 14, Plaintiff reported to the SLCC medical clinic as earlier instructed for a follow-up visit and tuberculosis shot.  (Id. at 143-44.)  It was noted that a December 2001 x-ray of her right ankle was normal, an October 2003 x-ray of her lumbar spine was normal, and a December 2003 x-ray of her left shoulder showed minimal degenerative joint disease.  (Id. at 143.)  The diagnosis was osteopenia, degenerative joint disease, low back pain, and hyperlipidemia (elevated levels of lipids in the blood plasma).  (Id. at 144.)  She was prescribed various medications, including Vioxx, an anti-inflammatory, and was to be referred to the nutrition clinic.  (Id.)

Thinking she had a boil and an infection, Plaintiff went to the urgent care center on September 10. (<u>Id.</u> at 203, 207-11.) She was diagnosed with and treated for vaginitis. (<u>Id.</u> at 209-10.)

On September 21, Plaintiff returned to the clinic with complaints of low back pain for the past two days. (<u>Id.</u> at 141-42.) She had difficulty bending and standing or sitting for any length of time. (<u>Id.</u> at 141.) The diagnosis was low back pain, degenerative joint disease, iron deficiency anemia, due to menstrual cycles, and hyperlipidemia. (<u>Id.</u> at 142.) She was scheduled for tests and an appointment with neurology, was prescribed various medications, including Vioxx and Cyclobenzprine (prescribed for the treatment of muscle spasms), and was cautioned about side effects of drowsiness. (<u>Id.</u>) Blood tests indicated high cholesterol, low white blood cell counts, and low iron. (<u>Id.</u> at 157-58, 160-61.)

Three days later, Plaintiff went to the urgent care center for lower back pain of five days duration and frequent urination. (<u>Id.</u> at 200-02, 204-06.) She was alert and oriented to time, place, and person and was in no apparent distress. (<u>Id.</u> at 202.) She had a relaxed posture. (<u>Id.</u>) The diagnosis was muscular spasms and low back pain. (<u>Id.</u>) Her dosage of Cyclobenzaprine was increased, she was to apply heat to her back, and she was to continue taking her home medications. (<u>Id.</u> at 202, 205.)

Plaintiff complained to the physicians at SLCC on October 18 of a discharge and pain in her pelvic area and lower abdomen for the past month. (<u>Id.</u> at 139.) She also complained of sporadic low back pain for the past few months. (<u>Id.</u>) The pain was sharp and stabbing and lasted five minutes. (<u>Id.</u>)

Plaintiff went to the urgent care center on November 5 for a rash and pain in her lower abdomen. (Id. at 195-99.) She was given Naprosyn and an antibiotic ointment and was instructed to follow-up with her primary care physician. (Id. at 197.)

On November 15, Plaintiff went to the neurology clinic for lower back pain. (Id. at 137.) She had been attending physical therapy sessions, but the pain was persistent. (Id.) Walking caused pain; the pain medications did not help. (Id.) Because of the pain, she could not work or do any chores at home. (Id.) She was applying for disability. (Id.) Her gait was steady. (Id.) Her muscle strength was 5/5, and she had no complaints of pain with straight leg raises.[4] (Id.) It was noted that an MRI[5] of her lumbar spine showed a disc bulge at L4-L5. (Id.) The examining physician opined that her pain did not have a neurological etiology and was probably musculoskeletal in origin. (Id.) She was to continue taking Naprosyn and was to return in six months or as needed. (Id.) A pelvic sonograph revealed multiple uterine fibroids and multiple follicular cysts in the right ovary. (Id. at 163.)

Plaintiff consulted the SLCC physicians again on November 23 for complaints of stomach and uterine pain. (Id. at 135-36, 154-56.) It was thought that she had an iron deficiency due to excessive bleeding during her menstrual periods. (Id. at 135.)

Plaintiff missed her appointment on November 26. (Id. at 134.)

---

[4]A straight leg raise test is performed by a physician raising the leg up of a patient when the patient is lying flat on her back on the examining table. Medscape Today, Managing Chronic Pain" Guidelines for Primary Care Physicians, http://www.medscape.com/viewarticle/487702_9 (last visited Jan. 20, 2009). A positive straight leg raise or pain on such a raise is indicative of spinal problems. See Id.

[5]The MRI report itself is not included in the record.

On February 28, 2005, Plaintiff returned to SLCC with complaints of pain in her back, joints, and right foot.  (<u>Id.</u> at 133.)  The pain had begun after she felt a "popping" sensation in her back a few weeks before.  (<u>Id.</u>)  She had been taking Naprosyn.  (<u>Id.</u>)  She was to continue taking it and was referred to the neurology clinic.  (<u>Id.</u>)  A urinalysis was negative.  (<u>Id.</u> at 153.)  A lumbar spine x-ray revealed minimal degenerative change.  (<u>Id.</u> at 162.)

Plaintiff had an annual check-up at SLCC on March 14.  (<u>Id.</u> at 129-32.)  She complained of a clear, thin discharge with a slight odor and abdominal pain in her lower right side.  (<u>Id.</u> at 129.)  She also had a sharp pain in her chest, unrelated to exertion, and low back pain that was getting worse.  (<u>Id.</u> at 131.)  She was referred to the neurology clinic for her complaints of low back pain, was to continue her current medications, and was to have an electrocardiogram ("EKG") or stress test for her chest pain.  (<u>Id.</u>)  Blood tests for hepatitis and sexually transmitted diseases were normal.  (<u>Id.</u> at 149-50.)

The next week, Plaintiff consulted a SLCC neurologist for low back pain that had worsened during the past month.  (<u>Id.</u> at 127-28.)  The pain began in the back and radiated to her right thigh and down to her right foot.  (<u>Id.</u> at 127.)  Her walking had only recently been affected by the pain.  (<u>Id.</u>)  She also had chronic bladder urgency.  (<u>Id.</u>)  Plaintiff reported that the Darvocet was not helping.  (<u>Id.</u>)  She was prescribed another medication and was to return in four months.  (<u>Id.</u>)

On April 28, Plaintiff went to the urgent care center for pain in her right leg and upper thigh.  (<u>Id.</u> at 190-93.)  She was discharged with instructions to take ibuprofen as needed for

pain and to follow-up with her primary care physician.  (Id. at 192, 193.)  The diagnosis was sciatica.  (Id. at 193.)

On May 9, Plaintiff returned to the neurology clinic for complaints of pain in her right hip radiating down her right leg and a sharp pain in her left flank.  (Id. at 123-25.)  The right hip pain came on suddenly and kept her awake at night.  (Id. at 123.)  On examination, she was described as being in mild distress.  (Id.)  Her gait favored her right leg.  (Id.)  The neurologist's impression was of acute or chronic low back pain that conformed to neurologic distribution.  (Id.)  A musculoskeletal origin of the pain was suspected; however, a urinary tract infection should be ruled out given the location of the pain and her mild fever.  (Id.)  Plaintiff was prescribed Percocet, with no refills, was to increase the dosage of an antibiotic, and was to give a urine sample.  (Id. at 124.)  She was to return in three months.  (Id.)

On May 11, Plaintiff went to the urgent care center complaining of pain when voiding and left flank pain that was ten on a ten-point scale.  (Id. at 185-89.)  The pain had begun two months before but had recently increased in severity.  (Id. at 187.)  She had a history of disc problems.  (Id.)  On examination, she was in no apparent distress and was alert and oriented to time, place, and person.  (Id.)  She had no fever.  (Id.)  She was tender at her paravertebral muscles on her left side.  (Id.)  She was discharged with instructions to continue her home medications, use warm compresses, and follow-up with her primary care physician on May 24.  (Id.)

Plaintiff did not keep her May 25 appointment for a stress test.  (Id. at 122.)  She did go to the urgent care center that day with complaints of frontal headaches for the past five

days.  (Id. at 180-84.)  Over-the-counter medications were not helping.  (Id. at 181.)  Light and noise bothered her.  (Id.)  She was advised to continue taking her home medications and to go to the emergency room if the symptoms persisted.  (Id.)

Two days later, Plaintiff consulted her primary care physician about bad headaches for the past six days.  (Id. at 121.)  The cause of the headaches was not clear.  (Id.)  Plaintiff was given Tylenol #3 and referred to a neurologist.  (Id.)

Plaintiff went to the urgent care center on August 16 for left leg pain of several days duration.  (Id. at 173-79.)  Her leg was tender on palpation.  (Id. at 176.)  The diagnosis was shin splints, the treatment was heat three times a day and ibuprofen twice a day with food.  (Id. at 176, 177, 178)  She was discharged within thirty minutes.  (Id. at 174.)

Plaintiff was to be seen next at SLCC on January 9, 2006.  (Id. at 242.)  She did not keep that appointment, or the one for February 6.  (Id. at 241-42.)  She returned to the neurology clinic on February 27.  (Id. at 238-40.)  She reported a worsening of her back pain since the last visit.  (Id. at 238.)  The pain radiated across her right hip and down her right thigh.  (Id.)  She was urinating up to 48 times during a 24-hour period.  (Id.)  Her gait was antalgic[6]; her straight leg raising was negative.  (Id.)  The impression was of failed back syndrome for the past 22 years.  (Id. at 239.)  She was discharged from the clinic with instructions to follow-up in six months.  (Id. at 240.)

---

[6]An antalgic gait is one in which "a limp is adopted to avoid pain in the weight bearing" leg. Laura Inverarity, D.O, Gait, http://physicaltherapy.about.com/od/abbreviationsandterms/g/Gait.htm (last visited Jan. 20, 2009).

On May 8, Plaintiff consulted the physicians at the Grace Hill Neighborhood Health Centers for her complaints of chronic low back pain, right hip pain, and left thigh pain. (Id. at 243-46.) She reported a history of degenerative disc disease. (Id. at 246.)

On June 5, Plaintiff returned to the SLCC clinics after breaking the fourth toe on her right foot. (Id. at 247-52.) The toe was taped. (Id. at 252.) It was noted that her medical history included a pinched back nerve with pain radiating down her right leg. (Id. at 251.)

In addition to Plaintiff's medical records, the ALJ had before him the report of a consultative examination of Plaintiff on November 8, 2005, by Clodualdo A. Gamez, M.D. (Id. at 231-37.) Her chief complaints were listed as arthritis in her hips and headaches. (Id. at 231.) She reported that she had begun to have right hip pain in 2001 and that it had become worse since. (Id.) The pain was now constant and was worse at night. (Id.) She also had left hip pain. (Id.) She took analgesic medication, which made her sleepy. (Id.) She only got out of bed to use the bathroom and eat meals, which were prepared by her son. (Id.) She used a cane to walk; the cane belonged to her son's father. (Id.) She had been referred to physical therapy, but had been unable to attend because she had no insurance. (Id.) Plaintiff described her headaches as severe and primarily in the front. (Id. at 232.) The headaches caused blurry vision and started three months before. (Id.)

On examination, her back was straight. (Id.) "She complain[ed] of tenderness all over," and "jump[ed] and complain[ed] of severe pain" "even with [the] light touch of a stethoscope." (Id.) Her extremities showed no clubbing, cyanosis (discoloration of the skin and mucous membrane), or edema (swelling). (Id. at 233.) She had a full range of motion

- 15 -

in her cervical spine, her upper extremities, and, with encouragement, her knees. (Id. at 233, 236, 237.) She declined to participate in the test of the range of motion in her lumbar spine. (Id. at 233, 237.) Her gait was normal with use of a cane. (Id. at 233.) She was able to get on and off the examination table. (Id.) She had a limited range of motion in her hips. (Id. at 233, 237.) She had no swelling, redness, or deformities in her lower extremities. (Id. at 233.) Her vision was 20/25 in each eye when uncorrected. (Id. at 235.)

Dr. Gamez's impression was of mild degenerative arthritis in her lumbar spine and severe headaches. (Id. at 233.) He noted that the use of narcotic medications may be contributing to her limited mobility, "although there is noted exaggeration of her symptomatology during this examination as well as [Plaintiff] not being very cooperative during th[e] examination." (Id.)

The ALJ also had before him a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff completed by a disability examiner[7] in December 2005 and listing her primary diagnosis as degenerative joint disease of the lumbar spine, her secondary diagnosis as headaches, and other impairments as fibroid uterus. (Id. at 69-76.) These impairments resulted in exertional limitations of being able to occasionally lift twenty pounds, frequently lift ten pounds, and sit, stand, or walk about six hours in an eight-hour workday. (Id. at 70.) She was not limited in her ability to push or pull. (Id.) She had no postural, manipulative, visual, communicative, or environmental limitations. (Id. at 71-73.)

_____

[7]There's no evidence in the record that the person completing the PFRCA, W. Maple, is a medical professional. To the contrary, he or she is identified on another form as a "Disability Examiner – DDS."

## The ALJ's Decision

After summarizing Plaintiff's testimony, the ALJ addressed the first of the five steps in the sequential evaluation process, see pages 18 to 22, below, and noted that there was no evidence that she had engaged in substantial gainful activity at any relevant time. (Id. at 11-12.) He next found that she had a severe combination of impairments – mild degenerative disease of the lumbar spine and minimal degenerative disease of the left shoulder and left foot – but did not have an impairment or combination thereof that was of Listing-level severity. (Id. at 12, 16.)

Consequently, the ALJ addressed the third step of the process and assessed her residual functional capacity, thereby also assessing her credibility. (Id. at 12-13.) He found the observations by medical professionals that Plaintiff was in no acute distress[8] to be consistent with his observations of her demeanor at the hearing. (Id. at 13.) Also detracting from the credibility of her allegations of disabling pain were the observed exaggeration of her symptoms during the consultative examination and her lack of cooperation and effort. (Id.) Nor did Plaintiff's work history support her credibility. (Id. at 13-14.) Two months' income from SSI payments would exceed Plaintiff's total earnings prior to 1998. (Id. at 13.) The ALJ also noted that Plaintiff's inconsistent descriptions of her level of education further detracted from her credibility. (Id. at 14.)

---

[8]The "NAD" which sporadically was noted in Plaintiff's medical records is an abbreviation for "no acute distress" or "no apparent distress." Medical Abbreviations and Pharmaceutical Abbreviations, http://www.medilexicon.com/medicalabbreviations.php (last visited Jan. 15, 2009).

The ALJ next reviewed the objective medical evidence and found no evidence of any impairment that either interfered with or could be expected to interfere with her ability to work for twelve continuous months.  (Id. at 14-15.)  Those impairments did, however, preclude Plaintiff from engaging in heavy or strenuous exertion.  (Id. at 15.)  They did not, singly or in combination, "prevent her from standing and walking six out of eight work hours, sitting throughout a work day, pushing and pulling on arm and leg controls, and lifting and carrying up to 10 pounds frequently and 20 pounds occasionally."  (Id.)  Because Plaintiff had no relevant past work, the ALJ applied the medical-vocational guidelines to determine whether this residual functional capacity, together with Plaintiff's age and limited education, allowed Plaintiff to perform the full range of light work.[9]  (Id.)  The ALJ concluded that under the guidelines, Plaintiff could perform such work.  (Id. at 15-56.)  Consequently, she was not disabled within the meaning of the Act.  (Id. at 16-17.)

## Legal Standards

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 416.920.  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 416.920(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 416.920(c).  A "severe impairment" is "any impairment or combination of

_____

[9]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000). Some

medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez v. Barnhart**, 292 F.3d 576, 580-81 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ

to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824.  See also 20 C.F.R. § 404.920(f).  The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001).  "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability."  **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006).  See also **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (noting that the Guidelines may be employed if the nonexertional impairment does not diminish or significantly limit the claimant's RFC); Social Security Ruling 83-47C, 1983 W.L. 31276, *3 (S.S.A. 1983) ("[I]f the nonexertional limitation restricts a claimant's performance of a full range of work at the appropriate [RFC] level, nonexertional limitations must be taken into account and a nonguideline determination

made.").  If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole."  **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision."  **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision.  **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently."  **Strongson**, 361 F.3d at 1070.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [court] must affirm the agency's decision."  **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000).

Plaintiff argues that the ALJ improperly (a) assessed her RFC by (i) not basing it on any medical evidence and (ii) not contacting her treating physicians for their opinion of her RFC, and (b) relied on the medical-vocational guidelines by ignoring her pain and not calling a vocational expert.  The Commissioner disagrees.

RFC.  As noted above, "[a]t the fourth step [of the five-step evaluation], the ALJ determines 'whether the claimant's RFC is sufficient for her to perform her past work.'  An RFC is a medical question, and the ALJ's determination of a claimant's RFC 'must be supported by some medical evidence of the claimant's ability to function in the workplace.'" **Flynn v. Astrue**, 513 F.3d 788, 792 (8th Cir. 2008) (quoting <u>Cox v. Astrue</u>, 495 F.3d 614, 617 (8th Cir. 2007)).  "The ALJ also considers evidence such as the 'observations of treating physicians and others, and an individual's own description of [her] limitations.'" **<u>Id.</u>** (quoting <u>McKinney</u>, 228 F.3d at 863).

The medical evidence began in June 2004, one year after Plaintiff alleged she became disabled.  At a June 14 appointment, Plaintiff had a normal gait and full muscle strength.  In September 2004, Plaintiff described her back pain as being of five days' duration.  The first time she described her pain as limiting her movements was in November 2004.  Her gait was steady; her muscle strength was normal.  She had no pain on straight leg raises.  In February 2005, she reported that she had had back pain beginning a few weeks before.  A lumbar spine x-ray revealed only minimal degenerative change.  In April 2005 – two years after the earlier disability onset date – Plaintiff reported that her walking had only recently been affected by

her back pain. In May 2005, Plaintiff's gait was described as favoring her right leg. Two days later, however, she was not in apparent distress. She was to return to the neurology clinic three months after her May 2005 appointment; she did not return for nine months. Although her gait was then antalgic, her straight leg raising was negative. Five months after her May 2005 appointment, which was two months after she was to have returned, Plaintiff had a normal gait, with the use of a self-prescribed cane, during the consultative examination. She was able to get on and off the examination table.

This medical evidence supports the ALJ's findings that Plaintiff had the RFC to sit, stand, or walk for six out of eight work days and could lift twenty pounds occasionally and 10 pounds frequently. See **Flynn**, 513 F.3d at 793 (affirming finding of ALJ that claimant could lift 20 pounds occasionally and 10 pounds frequently based on physicians' observations that she had normal muscle strength and good mobility). Contrary to Plaintiff's argument, the ALJ did not defer to the RFC of the non-medical examiner, but based his findings on the medical evidence of record.

Plaintiff cites **Dewey v. Astrue**, 509 F.3d 447 (8th Cir. 2007), in support of her argument that the ALJ fatally erred by relying on the PRFCA completed by a non-medical consultant. That case is distinguishable from the instant case in three very important respects. First, as noted above, there is nothing in the record to support her contention that the ALJ relied on the examiner's RFC findings, unlike the ALJ's explicit references in **Dewey**. See **Id.** at 448. Second, the ALJ in **Dewey** thought the PRFCA had been completed by a physician; it had not. **Id.** at 449. There is no indication that the ALJ in this case thought that W. Maples

was a physician.  And, as noted in **Dewey**, a medical consultant is not required to sign the PRFCA under certain modifications to the disability determination procedures.  See 20 C.F.R. § 404.906(b)(2); Sieveking v. Astrue, No. 4:07cv0986 DDN, slip op. at 2 n.2 (E.D. Mo. Nov. 5, 2008) (noting that Missouri had adopted modified procedures).  Third, the limitations in the PRFCA were less restrictive than those given by an actual physician, Dewey's treating physician.  **Dewey**, 509 F.3d at 449.  Thus, the ALJ had given controlling weight to an assessment the ALJ mistakenly believed was authored by a physician and which was at odds with one authored by the claimant's treating physician.  **Id.**  The court held that in light of that more restrictive assessment and the ALJ's mistaken belief of the PRFCA's author's credentials, it could not conclude that the ALJ's error was harmless.  **Id.** at 449-50.  In the instant case, there is no misunderstanding of the disability examiner's credentials, no reliance on his or her PRFCA, and no contradictory findings by an treating physician.  Indeed, no physician placed any restrictions on Plaintiff.[10]  See **Raney v. Barnhart**, 396 F.3d 1007, 1010 (8th Cir. 2005) (affirming ALJ's RFC findings based, in part, on lack of any opinion by treating physicians that claimant was so impaired that she could not work at any job).

In addition to the objective medical evidence supporting the ALJ's RFC findings, he properly assessed her credibility when reaching those findings.

In contrast to her descriptions of severely debilitating pain at the hearing and in her application papers, Plaintiff did not demonstrate or complain of such pain to her providers.

---

[10]Plaintiff did ask for an excuse for work in July 2004.  This is puzzling as there is no indication in the record that she worked after 2001.

For instance, at the hearing she testified that it was hard for her to go from a seated position to a standing position; however, she was able to get on and off the examination table without difficulty. She testified that she lay in bed all day; however, her muscle strength was always normal on examinations. She testified that her back pain caused her to quit work in 2001; she stated in her application and other forms that she had to quit in 2003; and yet a 2003 lumbar spine x-ray was normal and her first complaint of back pain was in June 2004. She testified that her back pain was constant and debilitating, yet she routinely described it to health care providers as having begun some number of days before.

As noted by the ALJ, Plaintiff's poor work history detracts from her credibility. See **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006); **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006). A financial motivation to apply for benefits is a proper consideration when evaluating a claimant's credibility. See **Eichelberger v. Barnhart**, 390 F.3d 584, 590 (8th Cir. 2004). Additionally, the ALJ observed that Plaintiff did not appear to have any discomfort at the hearing. This observation was not "the sole basis of [the ALJ's] decision," but may be included "as one of several factors." **Lamp v. Astrue**, 531 F.3d 629, 632 (8th Cir. 2008); accord **Johnson v. Apfel**, 240 F.3d 1145, 1147-48 (8th Cir. 2001).

Inconsistencies in the record further detracted from Plaintiff's credibility. See **Polaski**, 739 F.2d at 1322. The ALJ noted the inconsistency in how far Plaintiff went in high school. Other inconsistencies include, but are not limited to, her testimony that she had no friends and the disability report completed by a friend who visited with her two or three times a week, her statement on one form that she could not follow verbal or written instructions well and on

another that she could, her testimony that she had to stop work in 2001 because of her back and her statement that it was January or July of 2003 that she had to stop, and her statement to one physician that she was participating in physical therapy sessions and to the examining consultant that she could not afford such sessions.

Plaintiff further argues that the ALJ failed in his duty to develop the record by soliciting opinions from her treating physicians about her RFC.

The ALJ has a duty to fully and fairly develop the record, "independent of the claimant's burden to press [her] case." **Cox**, 495 F.3d at 618 (8th Cir. 2007); accord **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004). This duty requires that the ALJ neutrally develop the facts, **id.**, recontacting medical sources, including treating physicians, and ordering consultative examinations if "the available evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004). If, however, a crucial issue is not undeveloped or there was no resulting prejudice or unfair treatment, the ALJ is not required to seek additional evidence. See **Goff v. Barnhart**, 421 F.3d 785, 791 (8th Cir. 2005); **Onstad v. Shalala**, 999 F.2d 1232, 1234 (8th Cir. 1993).

A crucial issue was not undeveloped in the instant case. Rather, it was developed and decided adverse to Plaintiff. Moreover, there is no indication that an inquiry of her treating physicians about her RFC would have resulted in a favorable response. See **Lacroix**, 465 F.3d at 886.

Application of the Medical-Vocational Guidelines.  Plaintiff next argues that the ALJ erred by not considering her significant nonexertional impairment of pain and, therefore, by relying on the Guidelines and not calling a vocational expert at step five.

The ALJ's application of the Guidelines, if appropriate, satisfies the Commissioner's burden at step five of establishing that there are jobs in the national economy that Plaintiff can perform.  The application of the Guidelines is inappropriate if Plaintiff's pain diminishes or significantly limits her RFC.  See **Holley**, 253 F.3d at 1093.  See also **Muncy v. Apfel**, 247 F.3d 728, 735 (8th Cir. 2001) ("Using the guidelines, an ALJ may find a claimant not disabled if the claimant does not have nonexertional impairments, or if the nonexertional impairment does not diminish the claimant's RFC to perform the full range of activities listed in the guidelines.").  "When the ALJ determines that a claimant's subjective complaints of pain are not credible and, therefore, do not diminish the claimant's [RFC] to perform the Guideline-listed activities, the ALJ may rely on the Guidelines." **Holley**, 253 F.3d at 1093.  For the reasons set forth above, the ALJ properly determined that Plaintiff's subjective complaints of pain were not credible.  Plaintiff's second argument is without merit.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently."

**Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (interim citations omitted). Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have up to and including **February 6, 2009**, by which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of January 2009.